IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

DAVID J. DAVIS,                                )
                                               )        8:06CV643
                      Plaintiff,               )
                                               )
        v.                                     )
                                               )        MEMORANDUM OPINION
MICHAEL J. ASTRUE,                             )
Commissioner of the Social                     )
Security Administration,[1]                    )
                                               )
                      Defendant.               )
_____                 )

        This is an action for judicial review of a final decision of the Commissioner of the

Social Security Administration ("Commissioner"). David Davis appeals a final determination

of the Commissioner denying his application for Social Security benefits.  This court has

jurisdiction under 42 U.S.C. § 405(g).

## I.  BACKGROUND

        On August 28, 2000, plaintiff David J. Davis filed an application for disability

benefits, alleging that he suffered from a disability beginning on October 30, 1999.  Davis's

application was denied initially and upon reconsideration.  Following a January 3, 2002,

hearing, an administrative law judge ("ALJ") denied benefits.  Filing No. 11, Social Security

Transcript ("Tr.") at 361-76.

        David Davis is now forty-eight years old.  He has previous relevant work experience

as a machine operator.  He attended school until tenth grade but states that he did not

_____

[1]Michael J. Astrue was sworn in as the Commissioner of Social Security on February 12, 2007.
Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted for
Commissioner Jo Anne B. Barnhart as the defendant in this suit.  No further action need be taken to continue
this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

pass eighth or ninth grade.  He later obtained a GED.  He was last employed in October 1999.  *Id.* at 232.  At the time of his application for benefits, Davis contended that he was unable to work because of difficulty lifting, bending and sitting and the need for frequent bathroom breaks.  *Id.* at 370.

Medical evidence in the record establishes that Davis has been diagnosed with irritable bowel syndrome ("IBS") since 2000.  *Id.* at 289, 328, 330.  He was treated for a chronic low back pain, a left knee meniscal tear, depression/anxiety, recurrent headaches, and a hernia by his treating physician, Dr. Gerald W. Luckey, at the Butler County Healthcare Center from 1999 to 2001.  *Id.* at 299-306, 324-48.  He was also treated at the Seward Family Medical Center in 2002 for depression, recurrent back strain, chronic recurring knee pain, polyarticular inflammation, arthritis, and irritable bowel syndrome.  *Id.* at 667, 684-86.  X-rays of his back show mild central disc protrusion at L4-5 and mild lumbar spondyliosis.  *Id.* at 304, 657.  He has been prescribed numerous medications and medical records indicate that he has not been able to tolerate many of them. [2]

Consulting psychologist Judy C. Magnuson performed a psychological evaluation at the request of Nebraska Disability Determination Services on November 6. 2001.  *Id.* at 319-23.  Testing showed that Davis has a full scale IQ of 76, a verbal IQ of 83, and a performance IQ of 72, which places him in the borderline range of intellectual functioning.  *Id.* at 321.  He is capable of spelling at the fifth grade level and performing arithmetic at the

---

[2]Physicians' records include the following notations:  "Xanax caused memory problems," "could not tolerate Ultracet," "Failed on Celebrex and Skelaxin," "Valium not working," "Darvocet and Tylenol # 3 don't work," "patient does not tolerate Vioxx," "Paxil not helping," "stopped Effexor due to transient side effects," "stopped Effexor due to subjective GI disturbance," "did not tolerate Celexa due to nausea," "Ultracet has been unsuccessful in the past," and "he has not tolerated Vioxx or Toradol."  Tr. at 677, 680, 679, 682, 683, 686, 691, 696 & 682.

third grade level.  *Id.* at 322.  Dr. Magnuson's diagnosis was "mood disorder due to irritable bowel and back pain with major depressive-like symptoms" and borderline intellectual functioning.  *Id.* at 323.  Dr. Magnusen determined that Davis's Global Assessment of Functioning ("GAF") was 55.[3]  *Id.*  She also stated that Davis was not capable of managing his own funds.  *Id.*  A work performance assessment submitted by his previous employer noted that he was not eligible to be rehired because of poor attendance and lack of productivity and that he "either chose or was unable to follow directions."  *Id.* at 235.

At the first hearing, Davis testified that before he was employed at his most recent job he chose to stay home and raise his children while his wife, a nurse, worked.  *Id.* at 53-58.  He stated that he was unable to work after he lost his job in 1999 because he "can't bend.  Can't sit for too long.  Can't lift over 40 lbs.  I have to go to the bathroom so often."  *Id.* at 59.  He testified he could sit for an hour at the most.  *Id.*  He stated that he cannot bend because of pain in his left side and because "the bowel is like bloated all the time and when you bend, it like smashes it."  *Id.* at 59.  He also stated he cannot stoop because his left knee does not bend.  *Id.* at 60.

Davis also testified that he had "no money to go to no doctors."  *Id.* at 62.  He testified that he could no longer act as "Mr. Mom," because all he could was sit, stand, and

---

[3]The Global Assessment of Functioning ("GAF") Scale is a rating system for reporting a clinician's judgment of an individual's overall level of functioning, not including physical impairments or environmental limitations.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. text revision 2000) ("DSM-IV-TR").  A GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Id.*; *see Cox v. Astrue,* 495 F.3d 614, 620 n.5 (8th Cir. 2007) (noting "[A] GAF score in the fifties may be associated with a moderate impairment in occupational functioning, and a GAF score in the forties may be associated with a serious impairment in occupational functioning.").

lay down.  *Id.* at 65.  He testified that he could not mow the lawn or do any gardening, but that he could wash dishes once in a while.  *Id.*

He stated he suffers from pain at the level of 9 or 10 on a scale of 1 to 10 for about twenty days out of the month.  *Id.* at 65-67.  He stated that he has three to five "good days" per month.  *Id.* at 78.  He also stated he was in constant pain in his back, hip and side and whole left leg.  *Id.* at 65.  He testified he uses a cane because his knee locks up.  *Id.* at 67.  He stated that his most comfortable position is to lie flat on his belly.  *Id.* at 68.  He also testified that he uses the bathroom seven to fifteen times a day.  *Id.* at 76.  He stated that he could not afford to go to the doctor or to purchase medications.  *Id.* at 81.

A vocational expert also testified at the hearing.  *Id.* at 85-90.  She addressed the issue of whether a younger worker with a GED could either go back to past work as a machine operator or could perform other light work.  *Id.* at 84.  The vocational expert  was asked to assume the claimant could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds, could stand or walk for six hours in an eight-hour day with normal breaks, could sit with breaks for six hours in an eight-hour day, could do postural activities such as climbing, stooping, kneeling, crouching, crawling on an occasional basis, and did not have restrictions in vision, communication, or environment, "but would need to have a job with ready access to a bathroom in case he experienced the irritable bowel and needed to take a break."  *Id.* at 84-85.  The vocational expert testified that, with those restrictions, the claimant's past work would be precluded and the frequent-bathroom-break restriction would also preclude the full range of unskilled light work.  *Id.* at 85.  She testified there were sedentary jobs such as that of a mail clerk, phototcopy clerk, or messenger that a

claimant with the above restrictions could perform.  *Id.* at 85-86.  She also testified that if the total amount of time spent standing or walking were reduced to two hours, there would be sedentary administrative support jobs that a claimant could perform.  *Id.* at 87.  The vocational expert further testified that, if Davis's testimony were considered credible, he would not be "able to return to his past work or to do any other work."  *Id.*

The ALJ found that Davis was not disabled.  *Id.* at 375.  In her decision denying benefits, she determined that Davis suffered from the medically determinable severe impairments of "irritable bowel syndrome, status post left knee meniscal arthroscopy, and L4-5 disc protrusion."  *Id.* at 374.  She stated that Davis testified that he had never had counseling for depression.  *Id.* at 370.  She acknowledged Dr. Magnuson's report and diagnoses, but determined that Davis's mental condition was not a severe impairment.  *Id.* at 377-68, 374.

The ALJ discounted Davis's credibility, stating "[t]he undersigned has determined that the objective medical evidence and the opinions of his treating physicians do not support the claimant's allegations of total inability to work."  *Id.* at 371.  She also stated:

> Finally, the undersigned notes that the claimant has not sought treatment for his impairment since early 2001.  If the claimant's pain is as severe as he has alleged, one would think he would have sought treatment since February 2001.  The undersigned recognizes that the claimant has lost Medicaid coverage but if the pain that the claimant alleges is as severe as he alleges, it is unclear to the undersigned why he has not sought relief form his problems, despite the loss of Medicaid.

*Id.* at 372.  The ALJ noted that Davis has had irritable bowel problems for fifteen years or more and that it "was part of the reason he stayed home and took care of the family," characterizing it as a "family decision."  *Id.* at 370.  Other than noting that Davis had not

sought counseling for his depression, the ALJ did not discuss the severity of Davis's mental condition.

She determined that Davis's severe impairments did not meet or equal any listed impairment, so as to render Davis presumptively disabled. *Id.* at 368. She then found that Davis could not perform his past relevant work, but that he had the residual functional capacity to perform light or sedentary work. *Id.* at 372-74. She noted, however, that Davis could not "work in a job setting that does not allow ready access to the bathroom." *Id.* at 372. Relying on the testimony of the vocational expert, the ALJ determined that there were jobs in the national economy that Davis could perform. *Id.* at 374.

Davis appealed the finding and submitted further evidence to the Appeals Council for consideration on review. Additional medical evidence submitted after the first hearing included a report from a psychological evaluation performed on August 14, 2002 by Dr. Robert Blinn. *Id.* at 668-673. Dr. Blinn found that Davis's depression was severe based on the Beck Depression Inventory II. *Id.* at 668-73. His diagnosis was "major depression, recurrent, severe." *Id.* at 672. He assessed Davis's current GAF to be 40.[4] *Id.* The Appeals Council also considered a work evaluation performed by a rehabilitation facility on June 2, 2003. *Id.* at 487-88. Davis competed work at the level of 19% to 24% of the norm, with accuracy of 65%. *Id.* at 487. The report noted that Davis was hampered by a "markedly slow pace, poor accuracy and quiet personality" and concluded that "it would be

---

[4]A GAF score of 40 indicates "some impairment in reality testin (e.g., speech is at times illogical, obscure or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. DSM IV-TR at 34.

6

very difficult for Mr. Davis to function in a competitive job market" and that he "would require assistance in maintaining any sort of community employment."  *Id.* at 488.

The Appeals Council remanded the case.  *Id.* at 401-03.  It found error in the ALJ's reliance on a consulting examiner's opinion to determine that Davis's mental condition was not severe.  *Id.* at 401.  It found that the ALJ's decision did not satisfy the requirements of Social Security regulations and rulings, noting that "the ALJ did not reconcile the inconsistency between the psychologist's diagnoses and a finding of no severe impairment."  *Id.*  The Appeals Council stated that an evaluation of the evidence of major depression was necessary.  *Id.* at 402.  The ALJ was directed to consider the new evidence, to obtain updated medical records and reports, and to obtain a consultative examination, if necessary.  *Id.*

During the appeals process, Davis filed another application for benefits alleging a disability onset date of June 10, 2002, due to irritable bowel syndrome, knee problems, back and leg pain, and depression.  *Id.* at 443-47.  His request for a hearing on that application was joined with his earlier claim.

Medical evidence presented in connection with the second hearing included records showing that he continued to be treated for chronic recurrent depression, irritable bowel syndrome, chronic anxiety disorder, and pain through 2003 and 2004.  *Id.* at 695-701.  He was also diagnosed as suffering from chronic myofascial pain syndrome.  *Id.* at 698.  His prescribed medications included Darvocet, Effexor, Amitryptiline, Ultram, Naprosyn, Hydrocodone, Ramitidine and Bentyl.  *Id.* at 695-97, 699.  In January 2003, physician's notes indicate that Davis was treated for multiple injuries sustained when he fell down

7

some steps at the court house and that he had  been incarcerated for stealing an Iguana and a Christmas tree.  *Id.* at 695.

Davis was examined at Blue Valley Mental Health Center on April 8, 2004.  *Id.* at 702.  A mental status exam revealed deficits in his short-term memory.  *Id.* at 705.  The psychologist, Dr. Ken VerMaas, noted that "[i]t is evident that the client is suffering from both depression and anxiety symptomology."  *Id.*  His fund of knowledge was estimated to be in the below average range.  *Id.*  The psychologist also found that Davis had "difficulty maintaining social functioning as he often will have panic attacks," that he had "difficulty with both concentration and attention" and that he "would have a difficult time adapting to changes in his environment," noting that "when he has to change medications it is often very difficult for him.*"  Id. at* 706.  Further, he found that Davis was not capable of managing his own funds, or of managing benefits if awarded.  *Id.* at 707, 713.  Davis was diagnosed as having "major depressive disorder, recurrent, moderate" and "Anxiety Disorder, Not Otherwise Specified (with panic attacks and social anxiety)."  *Id.* at 706.  Dr. VerMaas concluded that it would be difficult for Davis to regain many of his functional abilities because his mental disorders were longstanding, noting that his response to treatment may be mixed, "due to some of his noncompliant issues in the past."  *Id.* at 706.

In a Mental Residual Functional Capacity Assessment, Dr. VerMaas noted that Davis suffered a marked limitation in ability to deal with work stress.  *Id.* at 711.  He found that Davis was moderately limited in his ability to complete a normal workday without interruption from psychologically based symptoms and to perform at a consistent pace, noting that "memory of what needs to be done might be a problem" and that Davis "may

need many breaks for physical reasons." *Id.* He also noted that Davis had marked difficulties in maintaining concentration, persistence and pace resulting in failure to complete tasks in a timely manner. *Id.* at 712.

Other records from Blue Valley Mental Health Center show that Dr. Robert E. Blinn, a licensed clinical psychologist, examined Davis on June 26, 2003, and found that Davis appeared "to continue to experience significant depression issues," also noting that he "had significant problems with short-term memory tasks." *Id.* at 721. Dr. Blinn also noted that test results showed that Davis "should be followed closely for suicidal ideation and planning." *Id.* He diagnosed "Major Depression, Recurrent, Severe." *Id.* at 722.

Davis was again examined by Dr. VerMaas in January of 2005. *Id.* at 726-31. Testing showed Davis was in the severe range of depression. *Id.* at 728. Dr. VerMaas noted that Davis consumed his medications on a consistent basis, but that "due to Mr. Davis's symptomology consistent with panic attacks and depression, his ability to concentrate and attend therapy sessions may be compromised." *Id.* at 729-30. Dr. VerMaas again diagnosed Major Depressive Disorder and Anxiety and concluded that "[b]ecause of the severity and the chronicity of the client's current condition, his prognosis is judged to be guarded." *Id.* at 731.

In response to a medical questionnaire, Davis's treating physician agreed that the nature and severity of Davis's major depressive disorder, anxiety disorder, and borderline intelligence precludes or limits the necessary judgment insight and capability to maintain compliance with prescribed medications and/or treatment on a consistent basis. *Id.* at 715.

9

At the second hearing, Davis testified that he was always depressed, cries a lot and thinks of suicide.  *Id.* at 124.  He stated that he has no friends and will not answer the door. *Id.*  He also stated that he has problems with his memory.  *Id.* at 125. He stated he thought his symptoms of depression and anxiety had worsened.  *Id.*  He stated that he could not make himself go out in public because he gets so "worked up."  *Id.*  He also testified that he has panic attacks when he leaves his home.  *Id.* at 123.  During the attacks, he gets dizzy and sweaty and his heart hurts.  *Id.*  He stated that he feels like he is going to pass out.  *Id.*

He further testified that his doctor had imposed a lifting restriction of 17 pounds.  *Id.* at 109.  He stated that he had not applied for any jobs and that he thought he could not work because his "body would give out" and his "nerves would take over."  *Id.* at 112.  He acknowledged drug-seeking behavior in the past.  *Id.* at 115-16.  He testified that he had gone to jail for chopping down a neighbor's tree and that he felt that Xanax or Valium had caused his behavior.  *Id.* at 118-19.  He stated that he had not used alcohol for about ten years. *Id.* at 117.  He testified that he stopped taking Effexor because it made him "really sick and just feels weird."  *Id.* at 116.  He stated that took Amitryptiline for depression and anxiety and took Tramadol/Ultram for pain because it was not addictive.  *Id.* at 117, 128. He testified that he did not drive a car because of the medications he was taking.  *Id.* at 120-21.  He also testified that he did not attend church because of the crowds.  *Id.* at 125. He stated that he had been attending counseling before he went to jail.  *Id.* at 130.

Dr. Thomas England, a clinical psychologist, testified as a medical expert at the second hearing.  *Id.* at 130-47.  He testified that he had reviewed Davis's medical records.

*Id.* at 131.  He testified that there was consistent objective data to support Davis's diagnosis of major depression.  *Id.* at 132.  He also stated that he would consider Davis to be borderline in intellectual functioning, based on test scores that would still be valid.  *Id.* at 132-33.  Further, he stated that Davis's disability should be considered under the listing for anxiety disorders because of panic attacks and phobias and that evidence in the record suggested a personality disorder as well.  *Id.* at 133.  He also noted that "there is some evidence based on testimony that [Davis] may have had a period of prescription medication abuse which may have complicated the clinical picture."  *Id.* at 134.

When asked if any of the above disorders met or equaled the Commissioner's listings of presumptively disabling conditions, Dr. England stated that "the problem I'm going to have is I don't see any sustained periods of compliance with treatment," noting that "there certainly are some instances where the evaluations would support that his functioning is compromised."  *Id.* at 134.  He stated that at the present time and "certainly at points in the past," Davis's mental impairments imposed restrictions on activities of daily living at the "moderate level overall," but that he thought that, with proper medication and treatment, "we would be seeing a more mild level of impairment."  *Id.* at 135.

Dr. England testified that Davis also had marked limitations on social interaction. *Id.*  He stated, however, that with treatment, the limitations would be in the mild to moderate range.  *Id.*  He conceded that, even if compliant with treatment, Davis would be capable of only minimal social interaction.  *Id.* at 137.  He further stated that Davis's impairments resulted in marked difficulties in concentration, persistence and pace and that Davis's panic attacks reflected periods of decompensation.  *Id.* at 135-36.  Dr. England

11

also stated that Davis's cognitive impairment would have an impact on his concentration, persistence, and pace. *Id.* at 135.

Any conclusions that Davis's impairments were mild were based on an assumption that Davis complied with treatment and that treatment was effective. *Id.* at 137-40. He stated that it was possible that Davis's condition would improve with treatment, but acknowledged that he could not "make that prediction in a given case." *Id.* at 145. He testified that the record indicated that Davis's mental condition had worsened. *Id.* He agreed with Davis's treating psychologist that, if Davis's testimony were considered credible, a GAF of 40 or 42 would be appropriate, noting that "there have certainly been instances since his alleged onset date where he functions at a relatively low level." *Id.* at 138. Dr. England also acknowledged that the records indicated impulsivity and "either a lack of understanding, or lack of willingness to comply with the medication that had been provided" and that Davis had not shown "a very good level of judgment." *Id.* at 141. Dr. England further noted that there was no indication in the record of any lack of cooperation or malingering by Davis. *Id.* at 143.

Vocational expert Michael McKeeman also testified at the second hearing. *Id.* at 143-59. He first testified that he would regard Davis's former employment as semi-skilled rather than as a skilled job. *Id.* at 153. He was asked to assume a hypothetical claimant who could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk six hours out of an eight-hour day, sit six hours out of an eight-hour day with occasional postural activity such as climbing, balancing, stooping, kneeling, crouching and crawling, who should avoid exposure to fumes, dust and gases, and who is a smoker. *Id.*

12

at 154.  From a mental standpoint, the vocational expert was asked to assume that the claimant was limited to "doing routine repetitive tasks of a one, two, three step nature, with minimal social interaction, and minimal defined as occasional, brief, or superficial interaction" and limited to "jobs that are of a routine nature and do not require dealing with significant changes in the work setting."  *Id.* at 154.  The vocational expert testified that there would be light and sedentary jobs, such as a machine operator, an assembly worker, and cleaning jobs, in the national economy that a claimant with those limitations could perform.  *Id.* at 157.  The vocational expert also testified that there would not be any jobs that Davis could perform if his testimony were considered credible.  *Id.* at 157.  Also, he stated that if a claimant's work completion was limited to 19% to 24% of the norm with a level of accuracy of 65%, as outlined in Davis's work evaluation, there would be no jobs the claimant could perform.  *Id.* at 158.

On June 16, 2004, after consideration of the additional evidence, the ALJ again denied benefits.  *Id.* at 39.  She found that Davis had the following medically determinable impairments:   depression, anxiety, status post meniscal arthroscopy, and L4-5 disc protrusion.  *Id.* at 28.  She found that the impairments did not meet or equal the listings of impairments.  *Id.* at 30.  She further found that Davis could not return to his former employment, but determined that he had the residual functional capacity to perform light or sedentary work that existed in the economy and was therefore not disabled under Social Security regulations.  *Id.* at 31.  She found Davis's testimony was not credible.  *Id.* at 35.  She based her credibility finding on the fact that Davis applied for unemployment benefits, sought narcotics and once appeared in the emergency room without a cane.  *Id.*  She

further noted that Davis's credibility was further eroded by "the fact that he has been convicted of several misdemeanors and in fact has spent six months in jail." *Id.*

The ALJ afforded little weight to the GAF scores assessed by Davis's treating psychologists because they were  based entirely on the claimant's reports.  *Id.* at 35. Instead, she gave significant weight to the opinions of Dr. England, a consulting psychologist who never examined Davis, because "he is the only mental health professional who has had access to the claimant's entire file." *Id.*  She also found that Davis had not been compliant with his treatment regimen and therefore could not be found disabled under 20 C.F.R. 416.930(a)(b)&(c).  *Id.*

In this appeal, Davis alleges that the ALJ erred in:  (1) failing to find his irritable bowel syndrome was a severe impairment; (2) determining that Davis was not compliant in treatment; (3) affording improper weight to the opinions of treating, consulting, and reviewing physicians; (4) determining Davis's residual functional capacity; and 5) submitting an inaccurate hypothetical to the vocational expert.

## II.  DISCUSSION

### A.  Law

When reviewing a Social Security disability benefits decision, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995).  Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole.  *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996). "Substantial evidence is less than a preponderance, but enough that a reasonable mind

would accept it as adequate to support a decision." *Cox v. Apfel*, 160 F.3d 1203, 1206-07 (8th Cir. 1998).   In determining whether there is substantial evidence to support the Commissioner's decision, the court must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it.   *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits.   *See* 20 C.F.R. § 404.1520(a) (1998); *Cox v. Apfel,* 160 F.3d at 1206.  The determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and his or her age, education and work experience. 20 C.F.R. § 404.1520(a); *Flanery v. Chater,* 112 F.3d 346, 349 (8th Cir. 1997).   The Commissioner determines:  (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment or a combination of impairments that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.   *Cox v. Apfel*, 160 F.3d at 1206.

If the claimant is found to suffer from an impairment that is listed in the Appendix to 20 C.F.R. Part 404, Subpart P ("the listings") or is equal to such a listed impairment, the

claimant will be determined disabled without consideration of age, education, or work experience. *Flanery,* 112 F.3d at 349; 20 C.F.R. §§ 404.1525(a). The listings specify the criteria for each impairment that is considered presumptively disabling. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The listings for mental impairments generally consist of a set of medical findings that medically substantiate the mental disorder ("Paragraph A criteria"); a set of impairment-related limitations that show effect of the impairment on functions deemed essential to work ("Paragraph B criteria"), and certain additional functional limitations ("Paragraph C criteria").[5] 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(A), 12.04; *see generally Pratt v. Sullivan,* 956 F.3d 830, 834-35 & nn.7&9 (8th Cir. 1992). With respect to mental impairments, a certain review technique must be conducted and documented at each level of the review process, including the ALJ level. 20 C.F.R. § 416.920a(a)-(e); *Nicola v. Astrue,* 480 F.3d 885, 887 (8th Cir. 2007) (noting that documentation is generally provided in a standard form).

To be presumptively disabled by reason of depression, a claimant must satisfy criteria set forth in the listing for affective disorders in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. A claimant who meets the clinical finding criteria and exhibits two of the four

---

[5]The finding that a medically-determinable mental impairment exists under Paragraph A must be established by medical evidence consisting of signs, symptoms, and laboratory findings that are gleaned from a mental status exam or psychiatric history. *Id.,* § 404.1520a(b)(1). If a mental impairment is found under Paragraph A, the ALJ must rate the degree of functional limitation resulting from the impairment based on the extent to which the impairment interferes with the claimant's ability to function independently, appropriately, and on a sustained basis in four areas of function, the Paragraph B criteria, which are deemed essential to work. *Id.,* § 404.1520a(c)(3). The four areas are: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The degree of functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform those work-related functions. *Id.,* §§ 404.1520a(c)(4), 404.1520a(d)(1). If the Paragraph B criteria are not satisfied, the claimant may prove a listing-level impairment with reference to the Paragraph C criteria. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(A); § 12.04(C)(1)-(3).

functional restriction criteria is presumed to be disabled by depression. *See id.* A claimant may be presumptively disabled by reason of an anxiety related disorder if he presents medically documented findings of recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of once a week that result in either marked restrictions in two of the four categories or a complete inability to function outside the area of one's home. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06 (A)(3); § 12.06 (C).

The required level of severity for a listing-level impairment of mental retardation requires an onset of impairment before age 22, a valid verbal, performance, and a full scale IQ of 59 or less or a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. A person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning. *Maresh v. Barnhart,* 438 F.3d 897, 900 (8th Cir. 2006); *see also* 65 Fed. Reg. 50,753 (2000) (explaining that the regulations "permit us to use judgment, based on current evidence, to infer when the impairment began."). Borderline intellectual functioning is a condition defined as an IQ score within the 71-84 range while mental retardation is a score of about 70 or below. *Hutsell v. Massanari,* 259 F.3d 707, 709 n.3 (8th Cir. 2001); *see also* DSM-IV TR. at 741. A diagnosis of borderline intellectual functioning should be considered severe when the diagnosis is supported by sufficient medical evidence. *Hunt v. Massanari,* 250 F.3d 622, 625-26 (8th Cir. 2001).

A finding that a claimant's impairment is not equal to a listed impairment does not end the inquiry. *Shontos v. Barnhart,* 328 F.3d 418, 424 (8th Cir. 2003). An impairment can be found to be medically equivalent to a listed impairment in appendix 1 if it is at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 404.1526. "The medical equivalence regulation states '[i]f you have more than one impairment, and none of them meets or equals a listed impairment, we will review the symptoms, signs, and laboratory findings about your impairments to determine whether the combination of your impairments is medically equal to any listed impairment.'" 20 C.F.R. § 404.1526(a). *Shontos,* 28 F.3d at 424 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 404.1526(a)). The determination of medical equivalence is based on medical evidence, supported by acceptable laboratory and clinical diagnostic techniques. *Id.,* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 404.1526 (b). With respect to the listing for mental retardation, slightly higher IQ's (e.g., 70 to 75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support a medical equivalence determination. *Shontos* 328 F.3d at 424 n.7.

If a claimant has a severe physical or mental impairment that does not meet the listing, or is equivalent to the listing, the Commissioner will then assess residual functional capacity ("RFC"). 20 C.F.R. § 404.1520a(d)(3). "RFC is defined as 'the most [a claimant] can still do despite' his or her 'physical or mental limitations.'" *Masterson v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004) (quoting 20 C.F.R. § 404.1545(a)). Because a claimant's RFC is a medical question, an ALJ's assessment must be supported by some medical evidence of the claimant's ability to function in the workplace; however, the ALJ is not

18

limited to considering medical evidence exclusively. *Cox v. Astrue,* 495 F.3d 614, 619 (8th Cir. 2007).   When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others.   *Pearsall v. Massanari,* 274 F.3d 1211, 1217-18 (8th Cir. 2001).   In determining RFC, the ALJ must consider the effects of the combination of both physical and mental impairments. *Baldwin v. Barnhart,* 349 F.3d 549, 556 (8th Cir. 2003); *Cunningham v. Apfel,* 222 F.3d 496, 501 (8th Cir. 2000) (stating that the Commissioner is required to consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling); 20 C.F.R. § 404.1523.

A hypothetical question posed to a vocational expert as part of the RFC determination must precisely set out all the claimant's impairments that are supported by the evidence.   *Pickney v. Chater,* 96 F.3d 294, 297 (8th Cir. 1996).   The hypothetical question must capture the concrete consequences of a claimant's deficiencies.   *Id.*   The point of the hypothetical question is to clearly present to the vocational expert a set of limitations that mirror those of the claimant.   *See Hogg v. Shalala,* 45 F.3d 276, 279 (8th Cir. 1995).   Testimony based on hypothetical questions that do not encompass all of a claimant's impairments cannot constitute substantial evidence to support the Commissioner's decision.   *Hillier v. Social Security Admin.,* 486 F.3d 359, 365 (8th Cir. 2007); *Pickney,* 96 F.3d at 296.   Borderline intellectual functioning, if supported by the record, is a significant nonexertional impairment that must be considered by a vocational expert.   *Swope v. Barnhart,* 436 F.3d 1023, 1025 (8th Cir. 2006).

When assessing the credibility of a claimant's subjective allegations, the ALJ must consider the claimant's prior work history; daily activities; duration, frequency and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions.   *Tate v. Apfel,* 167 F.3d 1191, 1197 (8th Cir. 1999) (listing factors outlined in *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)).   "'An ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole.'"   *Jackson v. Apfel,* 162 F.3d 533, 538 (8th Cir. 1998) (quoting *Porch v. Chater,* 115 F.3d 567, 572 (8th Cir. 1997)).   A claimant may have disabling pain and still be able to perform some daily home activities.   *Burress v. Apfel,* 141 F.3d 875, 881 (8th Cir. 1998) ("the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work.").   Although acceptance of unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim of disability, the negative inference is not sufficient, of itself, to negate a claimant's credibility.   *Cox v. Apfel,* 160 F.3d at 1208.

It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.   *Sims v. Apfel,* 530 U.S. 103, 111 (2000) (noting that "Social Security proceedings are inquisitorial rather than adversarial").   It is well settled that the ALJ's duty to fully and fairly develop the record includes the responsibility of ensuring that the record includes evidence addressing the alleged impairments at issue from either a treating or examining physician.   *Snead v. Barnhart,* 360 F.3d 834, 838 (8th Cir. 2004) ("The ALJ possesses no interest in denying benefits and must act neutrally in developing the record").

20

A treating physician's opinion that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" will generally be given controlling weight.  *Reed v. Barnhart,* 399 F.3d 917, 920 (8th Cir. 2005); 20 C.F.R. § 416.927(d)(2).  The treating physician's opinion is given this weight because of his "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 416.927(d)(2).  By contrast, "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence."  *Kelley v. Callahan,* 133 F.3d 583, 589 (8th Cir. 1998); *Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir. 2000) (holding that it was improper for an ALJ to rely on the opinions of reviewing physicians alone).  In addition, "whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations also provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." 20 C.F.R. §404.1527(d)(2); *see Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir. 2000).

If an impairment can be controlled by treatment or medication, it cannot be considered disabling.  *Brown v. Barnhart,* 390 F.3d 535, 540 (8th Cir. 2004).  Failure to follow a prescribed course of remedial treatment without good reason is a ground for denying an application for benefits.  *Id.*; *see also* 20 C.F.R. § 416.930(b).  Before a claimant is denied benefits because of a failure to follow a prescribed course of treatment, an inquiry must be conducted into the circumstances surrounding the failure and a determination must be made on the basis of evidence in the record whether the prescribed

treatment would restore a claimant's ability to work or sufficiently improve his condition. *Burnside v. Apfel,* 223 F.3d 840, 844 (8th Cir. 2000).   In determining whether an impairment is reasonably remediable, the question is whether it is reasonably remediable by the particular individual involved, given his or her social and psychological situation. *Tome v. Schweiker,* 724 F.2d 711, 714 (8th Cir. 1984).   A lack of sufficient financial resources to follow prescribed treatment to remedy a disabling impairment may be an independent basis for finding justifiable cause for noncompliance with prescribed treatment." *Id.*; *Benson v. Heckler,* 780 F.2d 16, 18 (8th Cir. 1985).

### B.  Analysis

The court first finds the ALJ erred in failing to find that Davis's irritable bowel syndrome was a severe impairment.  There is no evidence in the record that Davis's condition had resolved or improved after the first hearing.  Davis continued to be treated for IBS.  At most, medical evidence indicates that the condition was "stable" or "status quo." After the first hearing, the ALJ determined that Davis's IBS was a severe impairment, and nothing in the record or the Appeals Council's decision changes that conclusion. Accordingly, the ALJ was charged with the responsibility to consider the IBS together with the mental impairments.  The error was compounded by the ALJ's subsequent failure to include the limitations caused by the IBS in a hypothetical to the vocational expert.

The ALJ also erred in failing to find Davis's borderline intellectual functioning was a severe impairment.  Medical records fully support the diagnosis and there is no evidence to contradict it.  The evidence establishes that Davis's IQ puts him in the borderline intellectual functioning range.  The psychiatric review technique analysis should have been

22

applied to the impairment. That Davis's low intellectual functioning may not be of listing-level severity under § 12.05 does not alter this conclusion. A claimant with a mental disorder of listing-level severity would be entitled to benefits on that basis alone. That is not the issue here, however. The mental impairment should have been considered with reference to the functional limitations that relate to a claimant's ability to work. The hypothetical question posed to the vocational expert should have included a description of concrete consequences of the claimant's intellectual deficiencies. The hypothetical presented to the vocational expert did not include the deficiencies in short-term memory that are supported by the record. Davis's diagnosis of borderline intellectual functioning is supported by the record and he was entitled to have the vocational expert consider this along with Davis's other impairments.

In addition, the ALJ erred in determining that a finding of disability was precluded by Davis's noncompliance with treatment. There has been no showing that Davis's failure to adhere to a certain medication or counseling regimen was "without good reason." The record shows that Davis was unable to tolerate the side effects of many medications and that certain antidepressant medications made him feel sick or weird or caused unusual reactions. Also, the record shows that he complied with prescribed regimens for the medications Amitryptiline and Ultram. There is evidence in the record of some past substance abuse and Davis should not be faulted for attempting to avoid addictive medications. Davis's reluctance to pursue counseling is explained by the fact that his anxiety disorder and phobia caused panic attacks when he left his house. Moreover, there is nothing is the record to show that a medication and/or counseling treatment regime would remedy his condition. Davis's treating psychologists regarded his condition as

23

somewhat intractable.  Dr. England's testimony on the issue was highly equivocal.  Davis's testimony, as well as the medical records, leave little doubt that Davis did not consciously decide not to follow "doctor's orders," but rather lacked the financial resources, discipline and judgment needed to understand and follow a treatment regimen of counseling and medication.

In her analysis of Davis's subjective complaints, the ALJ did not consider all of the relevant factors.   She failed to analyze Davis's work history in the context of his impairments.  His lack of a strong work history is consistent with his mental limitations.  The ALJ placed inordinate emphasis on Davis's candid admission that he elected at one time to stay at home to help raise his family.   That admission does not signify that Davis was not disabled.  She also placed inordinate reliance on Davis's criminal history to negate his credibility.   The facts of Davis's encounters with law enforcement authorities supports, rather than detracts from, his credibility with respect to disabling impairments.  His conduct is consistent with impulsivity and mental illness.

In addition, the ALJ failed to consider the objective medical evidence that supported Davis's allegations of disabling pain.   The diagnoses of bulging discs, knee problems, chronic myofascial pain syndrome and irritable bowel syndrome were based on objective medical findings.  The record shows that Davis consistently sought medical treatment for relief of his pain.   Any failures to obtain treatment can be explained by Davis's financial condition and lack of medical coverage.  Davis's minimal daily activities are consistent with a high level of pain and with a chronic mental disability.   Moreover, the record does not contain evidence of malingering.   In sum, the ALJ's reasons for discrediting Davis's testimony are not adequate to counter the evidence that supports his credibility.

Most importantly, the ALJ failed to properly credit the opinions of Davis's treating physicians.  There is substantial evidence from Davis's treating mental health professionals that he suffers from mental impairments that interfere with his ability to work.  The opinion presented by the Commissioner's consulting psychologist does not counter those opinions. In addition, the consulting psychologist's testimony relied on an assumption of efficacious treatment that is not supported in the evidence.  It appears that several of Davis's impairments are close to, if not at, listing-level severity.  There is evidence of listing-level depression, anxiety disorder, or mental retardation.  Substantial evidence supports a finding that the combination of Davis's impairments—borderline intellectual functioning, major depression, and anxiety disorder, together with his physical disabilities—are medically equivalent to a listed disorder.

### III.  CONCLUSION

The clear weight of the evidence points to a conclusion that Davis has been disabled since his alleged onset date of June 10, 2002.  Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate.  *See Hutsell v. Massanari,* 259 F.3d at 709 n.3 (8th Cir. 2001).  Accordingly,

IT IS ORDERED that the decision of the Commissioner is reversed and this action is remanded for an award of benefits.

DATED this 19th day of February, 2008.

BY THE COURT:


s/ Joseph F. Bataillon
Chief United States District Judge

25